UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| TUMWATER DEVELOPMENT LLC, *et al.*, | CASE NO. 2:22-cv-00100-JRC |
| Plaintiffs, | ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| v. | |
| KENNETH LEDERMAN, *et al.*, | |
| Defendants. | |

This matter is before the Court on defendants Kenneth Lederman and Foster Garvey's motion for summary judgment. Dkt. 22. The parties have consented to have this matter heard by the undersigned Magistrate Judge. *See* Dkt. 9.

Plaintiffs incurred substantial liability  and damages after an oil spill on their property polluted nearby waterways. Plaintiffs retained defendants, who negotiated a contract with environmental remediation specialists and tendered a claim to plaintiffs' insurers. Plaintiffs later brought this malpractice action alleging that defendants performed deficiently in both of these tasks. Because plaintiffs have failed to produce any evidence showing that defendants breached the attorney's standard of care, a necessary element of their malpractice claim, the Court GRANTS defendants' motion for summary judgment.

1

**BACKGROUND**

2

Plaintiff Chandulal K. Patel, a California resident, is the owner and managing member of

3

Tumwater Development, LLC ("Tumwater Development"). Dkt. 1, at 2. In December 2015,

4

Tumwater Development purchased the former Olympia brewery complex ("the property") in the

5

city of Tumwater, Washington, for about $4 million. Dkt. 23, at 19. Subsequent to Tumwater

6

Development's purchase of the property, the property sat idle, with numerous complaints of

7

crime and fires at the property. Dkt. 23, at 52–105.

8

On February 25, 2019, vandals broke into a decommissioned large electrical transformer

9

located on the property in an effort to steal copper wire. Dkt. 23, at 114–24. About 600 gallons of

10

transformer cooling oil, which contained toxic polychlorinated biphenyls ("PCBs"), spilled out

11

of the transformer and flowed through the property's drainage system into the Deschutes River, a

12

state waterway. From there, the PCBs flowed into Capitol Lake, a reservoir adjacent to the

13

Washington State Capitol. *Id.*

14

The City of Tumwater notified Tumwater Development of the spill, and Patel directed

15

Tumwater Development's representative, Michael Cole, to fly to Olympia and assess the

16

situation. Dkt. 23 at 125, 129. The State Department of Ecology also received notice of the spill,

17

which caused visible oil sheens on the surface of Capitol Lake. *Id.* at 123.

18

Mr. Cole, acting on behalf of Tumwater Development and Patel, then contacted Cowlitz

19

Clean Sweep ("CCS"), a contractor experienced in soils and waterway cleanup, to conduct site

20

assessment and cleanup activities. Dkt. 23, at 134–37. On February 26, 2019, CCS sent Cole a

21

work order for the immediate cleanup work, which Cole signed on Tumwater Development's

22

behalf, and CCS began cleanup work on the site. *Id.* at 138–39.

23

24

ORDER GRANTING DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT - 2

1      On March 9, 2019, about two weeks later, Cole contacted Petra Risk Solutions ("Petra"),

2 an insurer for Tumwater Development, to notify it of the spill. Dkt. 23, at 152–54. In an internal

3 email, a Petra employee noted that the insurance policy Tumwater Development carried for the

4 property contained a total pollution exclusion. Dkt. 23, at 153. That same day, Cole contacted

5 Kenneth Lederman, an attorney and environmental remediation specialist at the Seattle law firm

6 of Foster Pepper (now Foster Garvey) ("Foster"). Dkt. 1, at 4–5. Cole informed Lederman that

7 Tumwater Development and Patel faced demands from CCS for more security for payment of

8 the escalating cleanup costs—now estimated to be at least five million dollars—and that, without

9 satisfactory security for payment, it would turn over cleanup operations to the DOE or the federal

10 Environmental Protection Agency ("EPA"). Dkt. 23, at 144. Lederman, who is a former DOE

11 attorney, later explained in a deposition, that DOE or EPA takeover of cleanup sites deprives the

12 landowner of control over the scope, manner, and cost of the cleanup, typically resulting in

13 outsize liability. Dkt. 23, at 9–10. Thus, he prioritized keeping CCS at work on the cleanup,

14 Lederman spent the weekend of March 9-10 negotiating with CCS over its terms for continuing

15 cleanup work, advising Patel and Cole about his efforts, and seeking direction and input on their

16 preferences. Dkt. 23, at 9.

17      CCS maintained that it would not continue work on the site without a personal guarantee

18 from Patel and a cost-plus contract. At a deposition, CCS's representative confirmed that CCS

19 would not have proceeded with clean-up efforts unless these terms were met. Dkt. 23, at 205–06.

20 .On March 12, preferring this contract to the alternative of EPA control, Patel signed the contract

21 with CCS and thanked Lederman for his work. Dkt. 23, at 229. On March 15, Lederman

22 contacted Petra Risk Solutions to discuss the spill and the company's reporting form and confirm

23 that he had "full copies of all insurance policies maintained for the property." Dkt. 23, at 237.

24

ORDER GRANTING DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT - 3

1    The policy in question was issued by Colony Insurance Company ("Colony"). Dkt. 23, at 240.

2    That same day, Lederman provided the claim reporting form and insurance policy to Jack

3    Zahner, a partner at Foster with relevant experience in pursuing insurance recovery for insureds,

4    and asked him to review the policy and advise as to whether a legal basis existed to pursue a

5    claim. *Id.*

6    Zahner reviewed the policy, which had a limit of only one million dollars and a total

7    exclusion for pollution, as well as the requirement that the insured "see to it that [Colony is]

8    notified as soon as practicable of an 'occurrence' or an offense which may result in a claim."

9    Dkt. 23, at 265. The following Tuesday, March 19, Zahner prepared and sent an e-mail to

10   Lederman in which he expressed optimism that the claim for coverage of the pollution costs was

11   "worth pursuing," in spite of the policy's total pollution exclusion, due to recent favorable

12   developments in relevant case law. Dkt. 23, at 290. In the same e-mail, Zahner also asked for

13   further information regarding "the transformer and the vandals." *Id.* After receiving approval

14   from the plaintiffs that Friday, March 22, Lederman told Zahner to proceed with submitting a

15   claim to Colony, which he did the following Tuesday, March 26.

16   The same day, another contractor working on the cleanup, Environmental Partners, Inc.,

17   informed Lederman that the vandalized transformer would need to be removed from the property

18   immediately to prevent further leaks. Dkt. 23, at 313. Lederman informed Zahner that, while this

19   could complicate the insurance claim documentation process and hinder Colony's inspection of

20   the vandalized property, continued pressure from DOE meant that cleanup of any possible PCB

21   source was a higher priority. *Id.* The next day, March 27, Foster notified Colony that the

22   transformers would be moved and stated that, if Colony wished to inspect the transformers in

23   their present condition, it would need to do so within one day. Dkt. 23, at 315.

24

ORDER GRANTING DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT - 4

On May 20, 2019, Colony issued a reservation of rights letter to plaintiffs. Dkt. 23, at 334. In the letter, Colony did not deny coverage or a duty to defend, but asserted several potential bases for its reservation, including (1) the absence of any allegation of bodily injury; (2) the absence of coverage for expected property damage or injury; (3) the total pollution exclusion; (4) the absence of coverage for damage to Tumwater Development's own property; and (5) the timeliness of Tumwater Development's notice. Dkt. 23, at 334–40. As to this last basis, Colony noted in particular that the claim was filed approximately a month after the spill occurred, and that Colony had less than 24 hours' notice of its only opportunity to inspect the transformers before their removal. *Id.* at 340. However, in June 2021, Colony later agreed to defend Tumwater Development and tendered the full $1 million—the policy's limit—unconditionally. Dkt. 23, at 354.

Meanwhile, on May 7, 2019, plaintiffs defaulted on their obligations to CCS, which had mounted to $8 million; on May 9, 2019, the DOE announced that because plaintiffs were "not currently able to provide continuous funding to the spill response operations without interrupting clean-up activities," and "[b]ecause of the continued possible risks to human health and the environment," it would continue cleanup operations using state funds. Dkt. 23, at 118. That same day, plaintiffs retained litigation attorneys from the Cushman Law Firm ("Cushman"). Dkt. 23, at 36. Cushman commenced two declaratory judgment actions—one against Colony and DOE, and the other against CCS and DOE—in Thurston County Superior Court. Dkt. 23, at 357, 368. In response to the suit against it, CCS sought and was granted appointment of a receiver over Tumwater Development. Dkt. 23, at 362.

Over the next several months, Cushman assumed much of the legal work, and Foster withdrew its representation on September 2, 2019. Dkt. 23, at 394. Meanwhile, on August 30,

1   2019, DOE gave Tumwater Development and Patel notice that it would seek payment from both

2   of them as potentially liable persons under Washington's Toxics Control Act. Dkt. 23, at 397.

3   Ultimately, in February 2021, DOE ordered Tumwater Development to pay $11,370,424.90 in

4   cleanup costs covering its remediation efforts after CCS's withdrawal. *Id.* at 424.

5   **PROCEDURAL HISTORY**

6           On January 31, 2022, plaintiffs filed a complaint in this Court, alleging negligence on the

7   part of Lederman and Foster in negotiating the contract with CCS, failing to timely notify the

8   insurer of the spill, failing to provide the insurer with an opportunity to inspect the transformers,

9   and failing to timely notify the insurer of plaintiffs' loss and ongoing remediation effort. Dkt. 1,

10  at 8–9. Plaintiffs sought recovery of all damages sustained due to these allegedly negligent acts

11  or omissions, "including mitigation expenses and other consequential damages." *Id.* at 9. On

12  March 29, 2022, this Court imposed a pretrial scheduling order in response to the parties' joint

13  status report. Dkt. 16. This scheduling order provided that plaintiffs' initial witness disclosure

14  and reports would be due by September 2, 2022, while defendants' rebuttal expert disclosure and

15  reports would be due by September 30, 2022. Dkt. 16. While plaintiffs filed a single declaration

16  from J. Kay Thorne, an insurance expert, on September 1, 2022, they did not produce any reports

17  from attorney experts, leading defendants to file the instant motion for summary judgment on

18  October 13, 2022. Dkt. 22. Plaintiffs have not filed any response to the summary judgment

19  motion.

20  **DISCUSSION**

21  **A. Standard of Review**

22          Summary judgment is appropriate when a moving party shows that "there is no genuine

23  dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

24

Civ. P. 56(a). The materiality of a given fact is determined by the required elements of the substantive law under which the claims are brought. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Factual disputes that do not affect the outcome of the suit under the governing law will not be considered. *Id.*

Where there is a complete failure of proof concerning an essential element of the non-moving party's case on which the nonmoving party has the burden of proof, all other facts are rendered immaterial, and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Anderson*, 477 U.S. at 254. Once the moving party has carried its burden under Fed. R. Civ. P. 56, the party opposing the motion must do more than simply show that there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). The opposing party cannot rest solely on its pleadings but must produce significant, probative evidence in the form of affidavits, and/or admissible discovery material that would allow a reasonable jury to find in its favor. *Id.* at n.11; *Anderson*, 477 U.S. at 249–50. However, weighing of evidence and drawing legitimate inferences from facts are jury functions, and not the function of the court. *See United Steel Workers of Am. v. Phelps Dodge Corps.*, 865 F.2d 1539, 1542 (9th Cir. 1989).

**B. Plaintiffs' Malpractice Claim**

A legal malpractice claim requires a showing of (1) the existence of an attorney-client relationship giving rise to a duty of care to the client; (2) an act or omission by the attorney in breach of the duty; (3) damages to the client; and (4) proximate causation between the attorney's breach and the damages incurred. *Hizey v. Carpenter*, 119 Wn.2d 251, 260–61 (1992). Here, defendants allege that plaintiffs have failed to provide any evidence supporting the second and fourth elements of their claim. Dkt. 22, at 2. The Court focuses on the second element; if plaintiff

1 | fails to provide any evidence of a breach of the duty of care, its complaint must be dismissed and

2 | further analysis is unnecessary.

3 |      To breach the duty of care, an attorney "must fail to exercise 'the degree of care, skill,

4 | diligence, and knowledge commonly possessed and exercised by a reasonable, careful, and

5 | prudent lawyer in the practice of law'" in Washington. *Geer v. Tonnon*, 137 Wn. App. 838, 850–

6 | 51 (2007) (quoting *Hizey*, 119 Wn.2d at 261). The attorney judgment rule applies to determine

7 | when an alleged breach of the duty results from an error in an attorney's professional judgment.

8 | *Clark Cnty. Fire Dist. No. 5 v. Bullivant Houser Bailey P.C.*, 180 Wn. App. 689, 701, 704

9 | (2014). Pursuant to this rule, an attorney cannot be liable if a judgment decision was "within the

10 | range of reasonable alternatives from the perspective of a reasonable, careful, and prudent

11 | attorney" and the attorney exercised reasonable care in making that decision. *Id.* at 704.

12 |      The Washington Supreme Court has recognized that expert testimony is almost always

13 | necessary to establish a breach of duty in legal malpractice claims:

14 |      Law is admittedly a highly technical field beyond the knowledge of the
ordinary person. By its very nature, an action for professional negligence in the

15 | preparation and conduct of specific litigation involves matters calling for special
skill or knowledge—proper subjects for expert testimony.

16 | 

17 | *Walker v. Bangs*, 92 Wn.2d 854, 857–58 (1979) (citation omitted). The practice of law and the

18 | standard of attorneys' work are not within the common knowledge of laypersons; thus, an expert

19 | is required. *Geer*, 137 Wn. App. at 850–51; *see also Clark Cnty. Fire Dist.*, 180 Wn. App. at 705

20 | n. 5 (stating that "a plaintiff generally must present expert testimony that the attorney breached

21 | the standard of care" in a legal negligence case). "Without this evidentiary link [of expert

22 | opinion testimony], the plaintiff risks dismissal of the malpractice case for failure properly to

23 | establish the breach of the duty of care." *Hizey*, 119 Wn.2d at 265. However, such expert

24 | 

ORDER GRANTING DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT - 8

1    testimony is not required where the breach is such that it could fairly be considered within the

2    common knowledge of laypersons. *Walker*, 92 Wn.2d at 858.

3           Here, plaintiff has not provided an attorney's expert opinion on the standard of care to

4    which Lederman should have adhered. Plaintiff has filed a single declaration from J. Kay

5    Thorne, a former insurance claims handler who is not an attorney, to support his position. Dkt.

6    21. Plaintiffs' initial disclosures indicated that Thorne "may be called to testify regarding

7    insurance industry issues and industry standards" while indicating that a "[s]tandard of care

8    expert" was "to be supplemented" later. Dkt. 17, at 2, 4. Thorne's declaration does not offer an

9    opinion on the attorney's standard of care but, instead, only that

10

11           It is my opinion that the failure of Mr. Lederman and his law firm to
             promptly report the loss under the Tumwater LLC insurance policy until March
12           26, 2019, and March 27, 2019, caused Colony to issue a reservation of rights
             letter citing the delay in giving Colony a prompt notice and an opportunity to
13           inspect the transformers prior to their removal.

14    Dkt. 21, at 12. Plainly, this is not the opinion of an attorney expert, nor does it address the

15    attorney's standard of care.  It should also be noted that defendant Lederman and his law firm

16    notified Colony of the spill less than three weeks after first being retained by plaintiff.  Plaintiff

17    has offered no expert testimony that this violates a reasonable standard of care.  Nor is it within

18    the common knowledge of laypersons to conclude that this delay in reporting constitutes a

19    breach of a reasonable standard of care. *See Walker*, 92 Wn.2d at 858.  Defendants'

20    representation involved the negotiation of contracts and procurement of liability insurance in an

21    environmental remediation.  On such complex matters, an expert opinion is essential to impose

22    liability.

23           When expert testimony is not provided, and there is insufficient evidence within the

24    common knowledge of lay persons that the attorney breached any applicable duty, the attorney is

ORDER GRANTING DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT - 9

1   entitled to summary judgment dismissal of the malpractice claim. *See Geer*, 137 Wn. App. at

2   851–52. As this Court recently stated,

3           Here, plaintiffs proffered no expert opinions to indicate that defendants'
        conduct fell below the standard of care of a Washington attorney. As this Court
4       has recently reiterated, the party with the burden of proof must come forward with
        initial expert opinions:

5

6           Federal Rule of Civil Procedure 26(a)(2)(D) provides that parties must
        make expert disclosures "at the times and in the sequence that the court orders." A
7       party that "fails to provide information or identify a witness as required . . . is not
        allowed to use that information or witness to supply evidence on a motion, at a
8       hearing, or at a trial, unless the failure was substantially justified or is harmless."
        Fed. R. Civ. P. 37(c).

9   *U.S. Bank, N.A. v. Glogowski Law Firm, PLLC*, 339 F.R.D. 579, 580 (W.D. Wash. 2021).

10          As the plaintiffs in this action, Tumwater and Patel were bound by the scheduling order's

11  September 2, 2022 deadline for providing initial expert opinions. *See* Dkt. 16. "Since plaintiffs

12  generally bear the burden of proof, the expert opinions they offer will rarely be 'intended solely

13  to contradict or rebut' another expert's opinion. Instead, plaintiffs' expert opinions are generally

14  aimed at establishing the elements of their claims." *Glogowski*, 339 F.R.D. at 581. "In a typical

15  case, the plaintiff will be required to disclose its expert report by the initial deadline and then the

16  defendant may respond by the rebuttal deadline." *Id.* The defendant, by contrast, need not

17  produce any evidence regarding the standard of care until the plaintiff has established a prima

18  facie case. *Id.* In the *Glogowski* decision, Judge Coughenour went on to identify the

19  consequences of a plaintiff's failure to timely disclose experts on the standard of care:

20          There are some cases in which a plaintiff generally cannot prevail without
        producing expert testimony. *See, e.g. Reyes v. Yakima Health Dist.*, 191 Wn.2d
21      79, [86] (2018) ("The applicable standard of care in medical malpractice actions
        must generally be established through expert testimony."). In these cases, if the
22      plaintiff fails to disclose expert testimony by the deadline, the defendant may
        immediately move for summary judgment—and prevail—without incurring the
23      expense of hiring its own expert.

24

ORDER GRANTING DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT - 10

1 | *Id.*

2 |      Here, neither party disputes that plaintiffs have failed to disclose expert testimony on the

3 | attorney's standard of care before this Court's deadline. *See* Dkt. 16. Even if the Court were to

4 | accept plaintiffs' sole opinion, from a non-attorney insurance specialist, as its expert's report, it

5 | does not address the standard of care, a necessary element of plaintiffs' malpractice claim.

6 | Because there is "a complete failure of proof concerning an essential element of the nonmoving

7 | party's case," *Celotex*, 477 U.S. at 323, and given that plaintiff has not even argued otherwise,

8 | further analysis is unnecessary to dismiss plaintiffs' cause of action on summary judgment.

9 |      The Court also notes that defendants also claim that there are no damages because

10 | Colony ultimately paid policy limits despite its claimed late notice.  Dkt. 22, at 21.  Plaintiff

11 | provided no response to this apparently dispositive issue.  Thus, there appear to be at least one

12 | other reason why defendants' motion should be granted, but in light of plaintiff's complete

13 | failure to respond, the Court need not address the additional issues raised by defendants.

14 | **CONCLUSION**

15 |      The Court orders that defendants' motion for summary judgment dismissal (Dkt. 22) is

16 | GRANTED.

17 |      Dated this 19th day of December, 2022.

18 |

19 |

20 | J. Richard Creatura
Chief United States Magistrate Judge

21 |

22 |

23 |

24 |